(76 Misc. Rep. 345.)

HOPPER v. WILLCOX et al.

(Supreme Court, Appellate Division, Second Department.   May 17, 1912.)

1. MUNICIPAL CORPORATIONS (§ 992*)—TAXPAYERS' ACTIONS—NATURE.
    A municipal taxpayer's action is purely a statutory remedy, depending on Code Civ. Proc. § 1925, or General Municipal Law (Consol. Laws 1909, c. 24) § 51, and lies only where acts of officials to be enjoined are illegal or where fraud or collusion or bad faith exists, not lying to enjoin acts which are merely unwise or improvident.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 2157; Dec. Dig. § 992.*]

2. MUNICIPAL CORPORATIONS (§ 993*)—ILLEGAL CONTRACTS—INJUNCTION.
    A municipal taxpayer's action lies to enjoin waste of public funds under an illegal contract.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2158–2161; Dec. Dig. § 993.*]

3. MUNICIPAL CORPORATIONS (§ 873*)—POWERS—SUBWAYS.
    Const. art. 8, § 10, which prohibits gifts or loans by a city in aid of a corporation, does not prevent New York City from building subways and leasing them.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1845–1850; Dec. Dig. § 873.*]

4. CONSTITUTIONAL LAW (§ 16*)—CONSTRUCTION OF PROVISIONS.
    The intent of a written constitution must be determined in the light of the history of its enactment and the results which it was intended to secure; and, if the questioned act violates that intent, it is enough to condemn it, even if it evades the letter.
    [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 12, 16; Dec. Dig. § 16.*]

5. MUNICIPAL CORPORATIONS (§ 873*)—SUBWAY LEASE—VALIDITY.
    Contracts by the city of New York to lease new subways to be constructed by it, under which the lessee is to furnish the equipment and part of the money, the receipts are to be pooled and distributed by paying operating expenses, a fixed sum to the lessee and interest to both parties on their respective investments, and dividing the remainder, etc., do not violate Const. art. 8, § 10, which prohibits gifts or loans by a city in aid of a corporation, though no profit may result to the city, and though the lease establishes credit upon which the lessee can borrow enough to furnish the expenditures required of it.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1845–1850; Dec. Dig. § 873.*]

6. EVIDENCE (§ 83*)—PRESUMPTIONS—OFFICIAL PROCEEDINGS.
    In an action by a taxpayer to enjoin the leasing of subways built by New York City, it will be presumed that the majority vote of the electors in favor of the municipality's building such subways required by Rapid Transit Act 1891 (Laws 1891, c. 4), as amended by Laws 1894, c.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

752, § 12, was secured, in the absence of an allegation in the complaint to the effect that such a vote was not taken.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

**7. INJUNCTION (§ 118\*)—PLEADING—SUFFICIENCY OF BILL.**

Where a bill to enjoin the leasing of subways built by a city alleged that proceedings had been duly taken under and in accordance with the provisions of the Rapid Transit Act, whereby the commission was duly authorized to and did advertise for proposals for the building of the subways, either by private capital or at municipal expense, and that the city had prepared and was executing contracts in pursuance of the acts and proceedings set forth, but nowhere refers to the absence of a popular vote on the question as to the building of the subways by the city, it sufficiently shows compliance with the terms of the Rapid Transit Act 1891 (Laws 1891, c. 4), as amended by Laws 1894, c. 752, § 12, which requires a majority vote of the electors in favor of the building of such subways by the city.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 223–242; Dec. Dig. § 118.*]

Appeal from Special Term, Kings County.

Injunction by John J. Hopper against William R. Willcox and others. From a judgment for defendants, plaintiff appeals. Affirmed.

The following is the opinion of Blackmar, J., at Special Term:

These three cases are taxpayers' actions brought to enjoin the Public Service Commission of the First District and the city of New York from making contracts for the construction, equipment, and operation of new subways, which contain certain provisions claimed to be illegal. The Ryon and Hopper Cases are brought on by orders to show cause why injunctions pending the actions should not issue. In the Admiral Realty Company Case a motion is made for judgment on the pleadings. The cases coming on for argument together, and it appearing that demurrers had been interposed by the defendants in all the actions, it was agreed by counsel that all the demurrers should be tried as though brought on as contested motions pursuant to section 967 of the Code of Civil Procedure.

The only question before the court, therefore, is whether the complaints state facts sufficient to constitute causes of action.

[1] In order to exactly define the questions presented for determination, it is well to fix firmly in mind the nature and scope of a taxpayer's action. A taxpayer's action is a remedy which did not exist at common law, but is a creature of statute. Authority to institute it must be found either in section 1925 of the Code of Civil Procedure or in section 51 of the General Municipal Law (Consol. Laws 1909, c. 24). These laws have been construed by the courts to authorize such actions only in cases where the acts of the officials are illegal, or where fraud or collusion or bad faith exists. Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263; Ziegler v. Chapin, 126 N. Y. 342, 27 N. E. 471; Rogers v. O'Brien, 153 N. Y. 357, 47 N. E. 456. A taxpayer's action may not be maintained to enjoin official acts which are unwise or improvident. In the language of Judge Finch in the Ziegler Case, the courts decline "to become arbitrators between taxpayers and their municipal officers in every instance of disagreeing opinions or conflicting judgments." The courts cannot supervise the honest acts of officials in matters which the Legislature has committed to their discretion. They can interpose only to confine the officials within the scope of the powers conferred upon them and to prevent fraudulent acts. It follows that I am not concerned with the question whether the proposed contracts are wise or improvident, or whether the city is getting a good or a bad bargain. As there are no allegations of fraud, collusion, or bad faith, the only question is whether the contemplated action of the officials is within the scope of the power conferred upon them.

It is alleged in the several complaints, in substance, that the Public Service Commission and the Board of Estimate and Apportionment are about to enter into contracts with the Interborough Rapid Transit Company and the Brooklyn Union Elevated Railroad Company, or a company to be formed in its interests, which embody certain "fundamental provisions" which are illegal, and are about to expend large sums of money in preparing for and formulating such contracts.

[2] It will be noted that no formal contracts have been prepared, and that many of the provisions are yet to be agreed upon. But the defendants have by their demurrers admitted that such contracts will contain such fundamental provisions. If, therefore, such provisions are illegal, a case is presented in which the court can act to enjoin the waste of public funds in further proceeding with the preparation of the contracts. In this respect the case differs from Admiral Realty Company v. Gaynor, 147 App. Div. 719, 132 N. Y. Supp. 220, where a preliminary injunction was denied.

It will conduce to clearness to consider the proposed contracts separately, and I shall therefore examine, first, that proposed to be made with the Interborough Company.

This company now operates a line of subways beginning in the Bronx and at the northerly end of Manhattan borough, running thence southerly through the west side of the city to Times Square, thence easterly along Forty-Second Street to the Grand Central Station, thence southerly on the east side to city hall, thence through lower Broadway to Bowling Green, and, by a tunnel under the East river, to its terminus at the intersection of Flatbush and Atlantic avenues in Brooklyn. This subway was built by the city, equipped by the Interborough, and is operated under a lease. The lease for that portion north of the city hall runs for a term of 50 years, with privilege to the lessee of a 25-year extension. On that part south of the city hall the lease is for 35 years, with like privilege of extension. The subway runs through the heart of the city, and its operation has been profitable to the lessee. The earnings, over and above expenses and the rental paid to the city, have for the past two years averaged $6,335,000 per annum.

It is proposed to construct new subways, first, continuing the west side line down from Times Square to the Battery and thence under the East river by a tunnel, to Borough Hall, Brooklyn; second, continuing the east side line north through Lexington avenue and under the Harlem river to the Bronx; third, three extensions connecting with the northerly end of the east side subway and running practically to the northerly city line; fourth, through Forty-Second Street and under the East river by the Steinway tunnel, and thence by branches leading out into Queens borough; fifth, extending the subway in Brooklyn to the east, and, by branches, to the south. Some of the outlying extensions are to be subways and some elevated roads. The new construction, in connection with the present subway, will form two complete lines through Manhattan borough, each terminating in the Bronx at one end and in Brooklyn at the other, a lateral line to Queens county, and feeding extensions reaching out by branches into the outlying districts of the Bronx, Queens, and Brooklyn boroughs.

The estimated cost of the new subway construction is $112,000,000. The proposed contract is to provide that one-half of the cost, but not to exceed $56,000,000, shall be furnished by the Interborough and the remainder by the city. It is proposed to lease the system to the Interborough for a term of 49 years, and to level the existing leases to that term, so that they will all expire together. The Interborough is to furnish equipment to cost $21,000,000. The receipts of the whole system are to be pooled, and are to be used and paid as follows: First, the operating expenses, including damages for accidents, provision for depreciation, renewals, and obsolescence, taxes, insurance, rentals to the city of the existing lines, and amortization of brokerage charges; second, to the Interborough the sum of $6,335,000 each year, being the equivalent of the present yearly net earnings on the existing lines; third, to the Interborough 6 per centum per annum on $77,000,000 invested by that company in the new subway construction and equipment; fourth, to the city 8.76 per centum on its investment in the new subway, estimated at $56,000,000; fifth, the remainder to be divided equally between the city and the Interborough. Out of

the money received by the Interborough, it is to establish a sinking fund sufficient to amortise the principal of its investment in new subway construction and equipment. If the sinking fund of 1 per centum is not sufficient for that purpose, the city is to pay the balance on taking over the subway at the end of the lease. The proposals for contracts contain many other provisions which are not relevant to this inquiry, and therefore need not be mentioned. The proposal of the Interborough, which contains the provisions above set forth, seems to me indefinite in its terms. I have adopted the interpretation of it which appears to be acquiesced in by counsel, although I confess that I cannot find them all distinctly stated in its terms.

[3] The alleged illegality consists in the proposed pooling of the receipts of the old and new systems jointly operated; and in the so-called preferential payments out of such receipts to the Interborough. It is claimed that such provisions violate section 10 of article 8 of the Constitution. To decide whether they do or not is my task. This section, omitting what is irrelevant, is as follows: No city shall hereafter give any money or property or loan its money or credit to or in aid of any corporation; nor shall any such city be allowed to incur any indebtedness except for city purposes. The problem is much simplified by the decision of the Court of Appeals in Sun Publishing Association v. Mayor, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788. That action involved the constitutionality of the Rapid Transit Act (Laws 1891, c. 4), under which the present subway was constructed. The act authorized the construction of a subway by the city, and its lease to an operating company for a definite term of years, at a fixed rental, which should not be less than the interest on the bonds issued by the city to pay for its construction, plus 1 per centum for a sinking fund to retire them when due. It was claimed that the construction of a rapid transit railroad was not a city purpose, and that its lease to a private corporation, on the terms authorized, constituted giving property to or lending its credit to or in aid of such corporation. But the court held that it was a city purpose, and the lease did not constitute giving property or lending credit to the company. The city, therefore, so far at least as this constitutional provision is concerned, has the right to build the proposed subways and lease them to the Interborough Company. This proposition no one denies; but it is necessary to state it in order to get a firm footing from which to advance with the argument.

[4, 5] If the proposed lease is illegal, it is the provisions as to the rental which make it so. The argument is put in several ways. It is said (1) that the terms of the lease are such that the city may receive no rental whatever, that giving the use of property is the same as giving the property itself, and therefore the city is giving its property; (2) that the Interborough receives a preferential payment, out of the receipts, equal to its earnings on the present subway, that these earnings may not continue and probably will not if the present congestion is relieved, that, therefore, the city is guaranteeing the amount, and, as a guaranty imports credit, it is lending its credit; (3) that leasing the city's property on such favorable terms enables the Interborough to borrow, on a mortgage upon its leasehold, enough to furnish its share of the construction cost and the amount to be expended for equipment, and therefore the city is lending its credit to the company; (4) that pooling the receipts of the old and new subways constitutes a partnership, or a mingling of public and private funds in the subway enterprise, and it is this which the constitutional provision was meant to prohibit. It will be readily seen that the proposed contract does not violate the letter of the Constitution. The city does not give its property; it leases it. The city does not guaranty the yearly $6,335,000, for it does not pledge its credit that this amount will be realized. Leasing property, even if the lease be so valuable as to enable the lessee to borrow on it, is not lending the lessor's credit to the lessee; and, finally, there is no express prohibition in the Constitution against mingling public and private property, or against a partnership.

But the question is not so easily disposed of. The intent of a written constitution must be determined in the light of the history of its enactment and the results which it was intended to secure; and, if the questioned act violates that intent, it is enough to condemn it even if it evades the letter. The purpose of the constitutional provision is well known to all students of con-

stitutional history, and is plainly pointed out by Judge Haight in the Sun Case. It was to prevent any municipality, such as a city, or any quasi municipality such as a township, from aiding with its property, funds, or credit any railroad building of the kind then known. At that time all railroads were built and operated by private corporations in the interest of their stockholders. The notion that they owed any duty to the public was embryonic. They frequently exploited rather than served the people. To put an end to one phase of that exploitation was the purpose of the constitutional provision. It was not intended to limit the power of a municipality in securing a municipal railroad, for such a thing was then unknown. In examining the question, therefore, the consideration that the proposed roads are municipal roads serving a city purpose is of great importance. The city may devote its funds to securing the performance of a proper city purpose. All the money raised by taxation is so devoted; and under the doctrine of the Sun Case a rapid transit road subserves a city purpose as much as do streets, bridges, ferries, waterworks, or any other legitimate object of public expenditure. The city purpose in securing a municipal road is not to make money. Profit may arise incidentally, but the city purpose is to promote the welfare and convenience of its citizens. Herein lies the difference between a private railroad company and a municipal corporation. The one seeks primarily profits for its shareholders, the other the welfare of its citizens. The Interborough Company, if not driven by fear of competition, might hold on to its present profitable lease, leaving the east side of Manhattan and the lower west side unserved, and regardless of the needs of the outlying sections of the city. And it is not subject to just criticism for making the interests of its stockholders paramount. But in pursuit of a city purpose the city is justified in extending the road by its branches into the Bronx, Queens, and Brooklyn, although such extensions must necessarily be operated at a loss. It is justified in insisting upon a five-cent fare over the whole system, although that may tend to make the operation unprofitable. Many considerations, other than profit, move to the city. It secures, by the proposed contract, a five-cent fare over all the system. It secures two complete subways, one on the east side of Manhattan and one on the west. It gives transit accommodations to its citizens in the outlying portions of the Bronx, Queens, and Brooklyn. It secures the right of recaption of a completed system by the provision for the so-called exchange of logs. Being hampered by the debt limit, it secures the loan of $56,000,000 from the Interborough in constructing its subway, to be paid for from the earnings of the road. In determining whether the proposed contract gives the city's property or lends its credit to the Interborough, it is essential to consider, not merely the distribution of the receipts from operation, but other results which the city secures. It may be that a lease of a subway to an operating company might be so baldly in the interests of the lessee that it would constitute giving property. But, if the lease is given in furtherance of a city purpose, it would not necessarily constitute a gift, even if the rent reserved were nominal. The accomplishment of a city purpose might be of more value than a money rental. An illustration may be drawn from the ferry situation. Since the Dongan charter, granted in 1686, the city has owned ferry franchises and operated them, usually through lessees. Recently the ferry to Staten Island has been operated by the city. The result in the year 1910 was a deficiency of $439,019, without counting interest on the investment. This money the city paid to secure a proper city purpose. In 1909 the city leased the ferry from the foot of Broadway, Brooklyn, to the foot of East Twenty-Third street, New York, with the terminals, which the city agreed to acquire, for 10 years, at a rental of $1 per annum and an agreement on the part of the lessee to operate the ferry. Here is valuable property rented to a private corporation for a long term at a nominal rental. Yet this is not giving the property to the corporation in violation of the Constitution. A comparison of the terms of this lease with the results of the operation of the Staten Island ferry demonstrates that the agreement to maintain and operate the Twenty-Third Street ferry is a sufficient consideration for the lease. In the one case the city performs its own city purpose at a cost of over $400,000 per year. In the other the city secures the result through the agency of a ferry company by leasing it the city's property at a nominal rental. This is

an illustration of the proposition that the accomplishment of the city purpose is the consideration which prevents the lease of the subway being a gift, even though the financial returns to the city are problematical. The lease is, therefore, not a gift of the city's money or property to the lessee company.

It is argued that the lease, with its financial provisions, will so increase the lessee's credit as to permit it to borrow money on the leasehold, and that, therefore, the city is lending its credit to or in aid of the lessee. This argument is disposed of in the Sun Case. The lease of the present subway is a valuable asset of the Interborough, earning as it does upwards of six million dollars a year; but the Court of Appeals decided in the Sun Case that the law authorizing exactly that lease was not unconstitutional. If the argument is valid, any lease profitable to the lessee would be unconstitutional, for it would furnish the basis of borrowing. This would mean that every contract with the city is invalid, if profitable, which is a reductio ad absurdum.

The argument that the preferential assignment to the Interborough Company of a portion of the receipts of the combined system constitutes a lending of credit seems to me artificial. It depends entirely upon the use of the word "guaranty" in stating the argument. A guaranty does import the lending of credit. But obviously this provision does not constitute a guaranty. It is not a guaranty because it lacks the very element necessary to support the argument. The Interborough is entitled to a preferential payment out of the earnings only. A deficiency in any year is cumulative but only out of earnings. In no contingency is the city's credit pledged for this sum or any part of it. It is begging the question to call the provision a guaranty, and then declare it void because it is called a guaranty, and not because it is one.

The final argument is also built up upon a loose use of words. It is said that the intent of the Constitution is to prevent the mingling of public and private funds, or a partnership between public and private interests. I find no such words in the Constitution. The prohibitions of the Constitution are in plain English. No city shall give money or property or loan its money or credit to or in aid of any corporation. I cannot find that it makes these words any clearer to translate them into terms of indefinite meaning. To determine the question, it seems to me clear that we should decide whether the city proposes to give its money or property or lend its money or credit, and not wander off into inquiries whether the Constitution prohibits partnerships and whether a partnership is proposed, or whether the Constitution prohibits mingling public and private property, and whether that is proposed. This argument rests upon a dictum pronounced obiter in Walker v. Cincinnati, 21 Ohio St. 14, 8 Am. Rep. 24. This dictum has been carried into later opinions of the Supreme Court of that state, where it is directly relevant to the decision, and thus assumes the force of law at least for that commonwealth. A system of law which, like ours, "from precedent to precedent slowly broadens down," is the safest and strongest framework upon which to build society, industry, and government; but it is its peculiar weakness that it is constantly troubled by the question of the relevancy of precedents and pronounced opinions. Not every sentence dropped from judicial lips can be cemented into the structure of jurisprudence. A great deal of judicial labor is consumed in attempting to reconcile or distinguish, or, if that be impossible, to get rid of doctrines which a wider experience has proved not to be of universal application. The proposed contract is not a partnership according to the accurate meaning of that word in the law. It is therefore of no interest to us whether the intent of the Constitution is to prohibit partnerships. Whether there is a union of public and private capital depends on the meaning with which those words are used. In the present subway there is the union of the publicly owned road with the privately owned equipment. To my mind it is much easier to determine whether the contract gives the city's property or loans its credit than it is to decide whether the result is the union of public and private capital, or whether that is prohibited by the Constitution. I see no advantage to be gained by attempting to solve a problem by changing known quantities into unknown.

In their general terms the Brooklyn contract resembles the one with the Interborough. In some respects it is more favorable to the city, for instance, in that the preferential payments are not cumulative. But these details do

not affect the problem with which I am dealing. In one respect there is a difference which demands attention. The present roads operated by the Brooklyn Company are owned by it. It is proposed, therefore, to combine a city subway with a railroad owned by a private company, whereas the Interborough proposition is to unite lease to lease so that at the end of 49 years the whole system will be owned by the city. I notice this fact; but to my mind it does not affect the conclusion. The remarks made on the subject of the union of public and private capital are pertinent here. I find no prohibition against this in the Constitution.

At the time of the argument, it was urged that the proposed contracts were not authorized by the Rapid Transit Act, and were therefore ultra vires urbis. Since then the act has been radically amended. This action is to enjoin future acts of public officials, and therefore must be determined under the law as it exists at the time the decision is rendered, and not at the time the action was begun. I have not had the aid of counsels' argument in examining the amendments to the law; but it seems to me that they are broad enough to cover those elements of the proposed contracts claimed to be illegal. As the proposed contract is authorized by the statute, it is legal unless the statute is unconstitutional. The action, therefore, becomes practically an inquiry into the constitutionality of the statute. All intendments are in favor of the constitutionality of statutes. It is as much the duty of the Legislature, the mayor, and the Governor to consider the constitutionality of pending measures, when exercising legislative powers, as it is of the courts when passing on them judicially. Nothing but a plain violation of the Constitution justifies the courts in disregarding an act of the Legislature. It is only where the act so violates the Constitution that both cannot stand together, that the duty of the court to uphold the Constitution compels it to pronounce the invalidity of the law. Such is not the case here.

The contracts have not yet been formulated nor the details settled. The complaints allege and the demurrers admit that they will contain certain "fundamental provisions." It ·is the legality of these fundamental provisions only which I have considered. As the last act was passed for the purpose of authorizing the proposed contracts, I assume that the contracts, when drawn, will square with the act. I do not believe that the city has plenary authority as proprietor to make any contract it sees fit with its own property. A franchise is not assignable at common law. The only power, therefore, that a city has in disposing of the franchise to operate a subway is that granted it by statute. An examination of the bill which recently became a law shows that a pooling of the receipts of the new subways with those of the railroads operated by the lessees is authorized, and so is the so-called preferential payments therefrom to the lessees. These are the fundamental provisions which were challenged as illegal; and I have confined my inquiry to them. As these provisions are authorized by law, the only question left is whether they violate the Constitution. I hold that they do not, and therefore sustain all the demurrers and direct judgment for the defendants, with costs.

Argued before JENKS, P. J., and HIRSCHBERG, WOODWARD, BURR, and RICH, JJ.

Clarence J. Shearn, of New York City, for appellant.

George S. Coleman, of New York City (Oliver C. Semple and Le Roy T. Harkness, both of New York City, on the brief), for respondents.

PER CURIAM. Judgment affirmed, with costs, on the opinion of Mr. Justice Blackmar at Special Term, with concurring memorandum.

PER CURIAM. In this case a point was made upon the oral argument and in the brief of counsel for the appellant which seems not to have been presented to the court at Special Term, and is not con-

sidered by Mr. Justice Blackmar in his opinion, which we have adopted.

In the Rapid Transit Act of 1891 (Laws 1891, c. 4), as amended (Laws of 1894, c. 752), it is provided (section 12) that:

"The said board of rapid transit railway commissioners shall cause the question, whether such railway or railways shall be constructed by the city and at the public expense, to be submitted to the vote of the qualified electors of the city within which such railway or railways is or are to be constructed."

The act further provides for a canvass of the ballots cast, and makes it the duty of said board—

"to file with the county clerk of said county a statement which shall declare the total number of votes cast in said city 'for municipal construction of rapid transit road,' and the total number so cast therein 'against municipal construction of rapid transit road.' And the said railway or railways shall be constructed by the said city and at the public expense, if it shall be found from such statements so filed that there is a majority of the votes so cast in favor of such municipal construction."

Appellant contends that notwithstanding the amendments to the Rapid Transit Act passed since 1894, some of which definitely authorize subway construction, either at public cost or at the joint cost of the municipality and the contractor, the provision of the act of 1894, above referred to, relating to popular vote, stands unrepealed, and that these later amendments apply only where a "referendum vote" has gone against construction at the public expense.

[6, 7] We express no opinion as to whether the provisions of the act of 1894 are still in force and applicable to the present situation. We think that the point is not properly before the court. If the provisions of section 12 of the act of 1894 are still in force and applicable, and if a "referendum vote" is a condition precedent to the power of the rapid transit commissioners to award contracts to construct subways at the joint expense of the municipality and the contractor, there is no allegation in this complaint, nor anything from which it must be necessarily implied, that such vote was not taken and was against construction at the public expense. In addition to the presumption that public officers do their duty, the complaint alleges in express terms "that prior to September 1, 1910, proceedings had been duly taken under and in accordance with the provisions of chapter 4 of the Laws of 1891 and the acts amendatory thereof, known and hereinafter referred to as the 'Rapid Transit Act,' whereby the commission was duly authorized and did on that day advertise for proposals in the alternative"; that is, for construction, equipment, and operation with private capital, and for construction at municipal expense.

Again, it is alleged:

"Upon information and belief that in pursuance of said last-mentioned resolution of July 21, 1911, and the acts and proceedings hereinbefore set forth, said commission has prepared a tentative contract or contracts."

And again:

"That, in pursuance of the resolutions, negotiations, acts, and proceedings hereinbefore referred to in addition to preparing forms of contracts under which proposals could be received which would be in substantial conformity

with the resolutions, negotiations, acts, and proceedings hereinbefore set forth, the city has expended and will continue to expend large sums of money in the preparation of detailed plans and specifications."

And again:

"That in pursuance of the resolutions, negotiations, acts, and proceedings as hereinbefore referred to, the commission through the preparation of forms of contracts and plans and specifications, are taking steps to consummate in substantial conformity with the resolutions, negotiations, acts and proceedings hereinbefore set forth, arrangements embodying the following fundamental provisions."

Then at length are set forth the fundamental provisions which it is alleged make the contracts illegal contracts, and nowhere therein or in any other portion of the complaint is any reference made to the absence of a popular vote upon the question.