(155 App. Div. 213.)

### HOPPER v. WILLCOX et al.

(Supreme Court, Appellate Division, First Department. February 11, 1913.)

1. STREET RAILROADS (§ 13*)—CONTRACTS—CONSTRUCTION.

Whether the Public Service Commission in making contracts with a street railway company for the construction of rapid transit roads should make allowance for depreciation in the existing plant in determining the net earnings of the company for determining the rentals to be paid by it for the use of the present subway is for the commission to determine.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 13.*]

2. STREET RAILROADS (§ 13*)—CAPITAL VALUE—RULE FOR ESTIMATION.

The rule by which the capital value of the plant of a corporation is estimated for taxing purposes is different from that applied in estimating the net earnings of a going concern.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 13.*]

3. STREET RAILROADS (§ 13*)—SUBWAYS—CONTRACTS—PUBLIC HEARING.

The fact that the Public Service Commission adopted some suggestions after the preparation of a contract with a street railroad company for the construction of an underground railroad, and after public hearing thereon, did not require the contract to be submitted for a further public hearing; Laws 1911, c. 888, authorizing the commission to alter or amend the draft contract in its discretion after a public hearing.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 13.*]

4. STREET RAILROADS (§ 13*) — SUBWAYS — CONTRACTS — ACTION OF PUBLIC SERVICE COMMISSION.

The determination of the Public Service Commission as to whether a street railroad company with which the commission contracted for the construction of underground railroads should be permitted to issue bonds in a certain sum for constructing the roads cannot be reviewed in an action under General Municipal Law, § 51 (Laws 1909, c. 29 [Consol. Laws 1909, c. 24]), to restrain the commission from executing contracts with the company for constructing an underground road; it being for the commission to determine whether the bonds should be issued.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 13.*]

Appeal from Special Term, New York County.

Action by John J. Hopper against William R. Willcox and others, constituting the Public Service Commission for the First District, and others. From an order continuing an injunction restraining defendant Public Service Commission from executing contracts with defendant street railroad companies for the construction of underground railroads, defendants appeal. Reversed, motion for injunction denied, and injunction vacated.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Morgan J. O'Brien, George S. Coleman, James L. Quackenbush, George D. Yeomans, and Archibald R. Watson, Corp. Counsel, all of New York City, for appellants.

Clarence J. Shearn, of New York City, for respondent.

INGRAHAM, P. J. The plaintiff commenced this action as a taxpayer to restrain the defendants the Public Service Commissioners for the First District from executing certain contracts for the con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

struction of rapid transit railroads in the city of New York. The action is brought under section 51 of the General Municipal Law (chapter 29 of the Laws of 1909 [Consol. Laws 1909, c. 24]). That section provides:

"All officers, agents, commissioners and other persons acting or who have acted for and on behalf of any county, town, village or municipal corporation in this state and each and every one of them may be prosecuted and an action may be maintained against them to prevent any illegal official act on the part of any such officer, agent, commissioner or other person or to prevent waste or injury to or to restore and make good any property, funds or estate of such county, town village or municipal corporation by any person or corporation whose assessment * * * shall amount to one thousand dollars."

Section 1925 of the Code of Civil Procedure also allows an action to obtain a judgment preventing waste or injury to the estate, funds, or other property of a county, town, city, or incorporated village of the state to be maintained against any officer thereof by any taxpayer.

Under either of these provisions, however, it is necessary to allege that the act sought to be restrained was either an illegal official act, or that it will tend to waste or injure the property, funds, or estate of the municipal corporation. As this order appealed from enjoins the action of the Public Service Commissioners, they being state officers appointed for the performance of specific public duties, if the injunction cannot be sustained, it is quite important that there should be a prompt decision.

The complaint is largely upon information and belief, and the only affidavit to sustain its allegation is the affidavit of the plaintiff, who has no connection with either the Public Service Commission or the railroads, the parties to this contract. It is not necessary to analyze either the complaint or the contracts, and attention will merely be called to three points on which the plaintiff mainly relies to establish that these contracts are illegal.

These contracts had been under preparation for many months by the Public Service Commission in co-operation with the board of estimate and apportionment of the city of New York, and the result of negotiations with the two defendant railroad companies. After the contracts had been drafted and reduced to the form to be executed, notice of a public hearing upon the proposed terms and conditions of these contracts was given as required by law. Such public hearing was held on January 14, 1913, and was largely attended by officers of the municipality, by property owners upon the route of the railroads, and by representatives of various boards of trade and other similar associations. There seems to have been an ample discussion before the Public Service Commissioners of the terms of these contracts, and various amendments were suggested which were considered by the commissioners. After such public hearing, changes were made in some of the details of the contracts which it is claimed were all in favor of the city. When the contracts were finally perfected and were ready for execution, this action was commenced and their execution enjoined. After these contracts were prepared and were substantially

in the form in which they were at the time of the public hearing, three actions were commenced in the Second Judicial District, one by this plaintiff, one by a realty company, and one by another taxpayer. Thereupon the defendant demurred to the complaints, the demurrer was sustained by the Special Term, and this decision was affirmed by the Appellate Division in the Second Department and by the Court of Appeals. Admiral Realty Co. v. City, 206 N. Y. 110, 99 N. E. 241. The complaint of the plaintiffs in those actions did not charge fraud, collusion, or actual misconduct in the proposed execution of the contracts, but they attacked the latter as fundamentally illegal because violating the provisions of the Constitution which declares that no county, city, town, or village shall hereafter give any money or property or loan its money or credit to or in aid of any individual, association, or corporation, and the prevailing opinion in the Court of Appeals stated that:

"The only hope for success in this attack must be drawn from the first clause of the provision prohibiting a gift or loan of money, property or credit."

The Court of Appeals then examined the contract in connection with the amendment of the Rapid Transit Act. Chapter 4 of the Laws of 1891, as amended by chapter 226 of the Laws of 1912. It was held by the court that the amendment of section 4 of the Rapid Transit Act by chapter 226 of the Laws of 1912 was broad enough to authorize the contracts in question, and it was further held that this amendment of the Rapid Transit Act did not violate any provision of the Constitution. In so far as these contracts are the same as those considered by the Court of Appeals, it has been determined by that court that they are authorized by the Rapid Transit Act as amended as aforesaid, and the question would seem to have been finally settled that the Public Service Commission and the city of New York have legal authority to execute them. The state has vested the Public Service Commission, a commission appointed by the Governor, in co-operation with the municipal authorities, with power to make these contracts. As was stated by the Court of Appeals:

"It is to be borne in mind at the outset and at every point of discussion that this court has nothing whatever to do with the wisdom of the proposed contracts. If the municipality and the various officials acting in its behalf have the power to make them, then the questions of whether it is wise to do so, and whether their terms are advantageous for the municipality and the public, are solely for the consideration and decision of those officials. After all the criticism and discussion which have been directed at the present transit situation in New York, it is only just and reasonable to assume that public officials charged with the duty of bettering that situation have entered on their task with care, all the wisdom and foresight at their command, and with complete devotion to the public welfare. But, even if we should doubt whether they have reached the best possible solution of a great and perplexing problem, our sole and only duty still would be simply to determine whether the Constitution permits the legislation and contracts in question, and there again it is to be remembered that our duty is to be so discharged, if possible, within fixed principles of law as to uphold, rather than condemn, the legislation and the proposed action of the various state and municipal authorities thereunder." Admiral Realty Co. v. City, supra.

Accepting these as the assumptions to be indulged in in support of the action of these public officials, and considering that the Court of

Appeals have definitely determined that the legislation which authorized these contracts is valid, and that the contracts as then proposed were authorized by the Rapid Transit Act as amended, we will simply state how the complaint in its present form differs from the complaints reviewed by the Court of Appeals in the other actions, and our conclusion as to the three claims made by the learned counsel for the plaintiff, by which he contends that these public officials are about to commit an illegal official act or to commit waste and injury to property, funds, or estate of the city of New York.

The first twenty-six paragraphs of the present complaint are identical with that in the Admiral Company Case. The twenty-seventh and twenty-eighth are merely historical as to the formation of the New York Municipal Railroad Company. The twenty-ninth, in regard to the 1 per cent. sinking fund, has added to the paragraph as it was to the old complaint this clause:

"That the said surplus or bonus over and above the amount necessary to retire said loans or sums to be borrowed by said companies for the purpose of furnishing their respective contributions toward construction and for equipment would be and constitute a gift of city money and property to said corporations without any consideration whatever, would be a fraud upon the city and its taxpayers, and would be a wanton and illegal waste of the funds and property of the city of New York."

Paragraph 30 is new, and is as follows:

"Upon information and belief, that as part and parcel of said proposed contract with the Interborough Rapid Transit Company, and with the consent of said commission (defendants Maltbie and Cram dissenting therefrom), said company, having heretofore applied for permission so to do, intends, and said commission proposes, to authorize said company to issue $170,000,000 of 5 per cent. bonds to provide the funds for carrying out the various agreements in said proposed contract, and to sell said issue of bonds, without competition or public letting, and without any effort to obtain a better price at 93½ per cent. although said bonds are by said proposed contract authorized to be redeemed out of the earnings of said subway system at 110 per cent.; that said price of 93½ per cent. is an unfair price for said bonds and is far below the market value thereof; that said bonds would, if sold at public sale and under competitive conditions, realize a price at least equivalent to the par of said bonds, and based upon past sales of city bonds and bonds of other public service corporations in the city of New York would bring a substantial premium; that the sale of said bonds at 93½ per cent. is a fraud upon the city of New York and the taxpayers thereof, is a gift and gratuity, and is an illegal waste of the funds and property of the city of New York."

Paragraphs thirty-sixth and thirty-seventh are new in form, but it is claimed that the facts therein contained were before the Court of Appeals. They refer to the analysis of the financial features of the contract by Mr. Mitchell, the president of the board of aldermen, and contained in Exhibit 4. Paragraph 38 is new, but merely contains general allegations of bad faith and waste, without a statement of any specific facts to sustain those general allegations. It would appear that the only new matter suggested in this complaint is that touching the sale of its own bonds by the Interborough Company.

The modifications made in the contract since it was considered by the Court of Appeals have not substantially changed it in any of its fundamental provisions. The contracts therefore, as now proposed to

be executed, are substantially the contracts as originally prepared and presented to the Court of Appeals, and that were the subject of the prior hearing.

[1] The first claim is based upon subdivision 6 of article 49 and chapter 2 of the contract with the Interborough Rapid Transit Company in relation to the rental to be paid by the railroad company for the use of the present subway. It is there provided:

"One-quarter (¼) of the sum of six million three hundred and thirty-five thousand dollars ($6,335,000) to be retained by the lessee for each quarter year of the term of the lease as representing the average annual income from the operation of the existing railroads."

It is claimed by the plaintiff that this is an excessive amount, as these net earnings of the existing railroads were arrived at without making any allowance for the depreciation of the existing plant. This provision was inserted under the authority of section 24 and 27 of the Rapid Transit Act as amended by section 3, c. 226, of the Laws of 1912. It is expressly authorized by subdivision 2 of section 27 of the act which was added by the Act of 1912, which provides that:

"Any such contract shall provide for determining the amount of income, earnings or profits of the railroads whose gross earnings are so combined, and for such considerations may authorize the retention by the said railroad corporation for each year of the term of such contract, prior to the payment of any sums or of any part or portion of the income, earnings or profits to the city as rental for the use of the roads specified or provided for in such contract, of (a) a specified sum of money, which sum may represent the average annual income from operation of the said railroad or railroads theretofore constructed and operated by such corporation for any two or more years; (b) a sum not exceeding six per centum per annum for each year upon the investment of the said company including brokerage charges not exceeding three per centum, in the construction and equipment of the said road or roads of the city to be maintained and operated under such contract; and (c) a sum not exceeding the annual expense or cost to the contractor plus one per centum per annum on account of the contractor's investment in betterments or improvements upon or additions to such road or roads and equipment. Such contract may also provide that such annual payments shall be cumulative, and that any deficiency with respect thereto shall be paid off and discharged annually out of the said gross receipts before any payments by way of rental or compensation for the use of such roads shall be made to the city."

Under this provision, the commissioners were required to determine what specific sum of money should be allowed and might fix it as representing the annual average income from the operation of the railroads theretofore constructed for two or more years. It has ascertained that amount and fixed it at the sum of $6,335,000 a year. The plaintiff or his counsel seems to think that in fixing that amount they were required to charge the corporation with a certain sum for the depreciation of the plant and cars each year, but it is very evident that that was a matter for the determination of the commissioners. Here was a railroad operated and maintained out of its earnings. Its earnings were largely in excess of the cost of maintenance, and had for the last two years yielded a profit of over $6,000,000 a year. Whether in determining that net income a sum was to be allowed for depreciation was a question which clearly the commissioners had to

determine. It must be assumed that the commissioners had ascertained how much each year it was necessary to deduct from the earnings to maintain the system as it was, and that sum was, of course, deducted before fixing this amount of net earnings at $6,335,000 a year. If in each year the depreciation was made good out of the earnings, of course, no allowance would be necessary for the depreciation of the plant and rolling stock during the year, because that depreciation had been made good by renewals and repairs during the year. If no money was spent on the road for repairs and renewals, of course, the rolling stock and tracks and other appliances would deteriorate, but, if all deterioration was made good during the year out of the income as the cost of maintenance, why then at the end of the year there would be no depreciation.

[2] The rule by which the capital value of the plant of a corporation is estimated for the purposes of taxation is entirely different from that to be applied to an estimation of the net earnings of a going concern. All this question of depreciation and the amount to be allowed for it in the future is clearly a matter of expert knowledge, which necessarily must be submitted to the authorities who have to ascertain what was the income. It was purely a question for the commissioners to determine. If the commissioners have made a mistake in the amount of this allowance, it is one clause of many of the contracts, some in favor of the railroad and some in favor of the city, and which, to justify this attack, it seems to me must appear to be as a whole a waste or injury of the city property. It cannot be said that because one clause of the contract seems to be advantageous to the railroad, upon which it must be assumed that other clauses in favor of the city were agreed to, the whole contract should be condemned.

Moreover, the amount specified in the contract as the average net earnings represents the correct net earnings as shown by the operation of the railroad and presumably by the official reports required to be made by the company (Public Service Commissions Law [Laws of 1910, c. 480 (Consol. Laws 1910, c. 48) § 46]; Act Cong. Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), which it may reasonably be presumed was in the minds of the legislators; and it is the sum specified by the Interborough Company in its proposition to the Public Service Commission. In these circumstances the mere fact that as a result of negotiations between the Interborough Company and the Public Service Commission this sum was accepted as the net earnings without further deduction for depreciation, for which no disbursement is at present required, does not warrant the inference that the Public Service Commission is acting either fraudulently or in bad faith, or that the contracts will result in a waste of the public funds within the contemplation of the Taxpayers' Act. No other facts are alleged or shown in support of the charges of fraud and bad faith. The claim made in behalf of plaintiff is that these facts tend to show constructive fraud or bad faith; but we are of opinion that such inference is not warranted.

The second claim is that this contract was not submitted for a public hearing after the changes made subsequent upon the first public

hearing. But such a claim is clearly frivolous. The contract was prepared, its form was submitted to the public, and the public were invited to criticise it. Some criticisms were offered, some suggestions as to amendments made, both for the benefit of the public and for the benefit of the city; and the Public Service Commission, as they were bound to do, entertained those suggestions and in some cases adopted them and made the amendments.

[3] But the very object of the public hearing was to give the commissioners the benefit of such suggestions as should be made, and the fact that they adopted some suggestions did not make a new contract or require it to be submitted to a further public hearing, as the statute provides:

"The commission may, after the hearing to be had as above required, alter, modify or amend such draft contract in any manner in its discretion." Chapter 888, Laws of 1911.

The third objection relates to the price at which the Interborough Company has agreed to sell its bonds from which it will realize the money necessary to provide its contribution for the building of this road, as well as for further corporation purposes, including the payment of existing bonds. The plaintiff lays great stress upon the fact that here were 5 per cent. bonds which are to be sold by the railroad company at $93\frac{1}{2}$, and gives it as his opinion that the public would subscribe for the bonds if they were offered at public subscription. But the railroad company was required, in order to carry out this contract to which it was to contribute the sum of $80,000,000, to sell bonds to the amount of $177,000,000 to pay off their indebtedness and prior incumbrances.

[4] It was for the Public Service Commission to determine whether permission to issue these bonds should be granted, and that determination cannot be reviewed in this action. This contract has nothing to do with the terms upon which the Interborough Railroad Company would borrow its money. It is entirely immaterial, so far as the city is concerned, what the Interborough Railroad Company pays for the money that it is to obtain, so long as the contributions for interest and amortisation to be paid out of the receipts are calculated upon the amount invested, and not upon the amount of the bonds issued, which is the plain provision of the contract.

These are the three points which it is necessary to discuss, and we think they are all without foundation. We think no fact is alleged which would justify a finding that the Public Service Commission in signing these contracts were about to commit an illegal official act, or to suffer any waste or injury to the property or funds of the city, or to do any act beyond the discretion expressly vested in them by law.

The other objections to this contract have been examined. There are none of them sustained, and it is not necessary to discuss them.

It follows, therefore, that the order appealed from must be reversed, the motion for an injunction denied, and the temporary injunction vacated, with $10 costs and disbursements to the defendants. All concur.